# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                       Plaintiff,<br>   vs.<br><br>JESUS HECTOR PALMA-SALAZAR,<br><br>                       Defendant. | CASE NO. 95CR2153-LAB<br><br>**ORDER DENYING MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582; USSG 1B1.10** |

**Preliminary Statement**

About a year ago, Amendment 782 to the United States Sentencing Guidelines ("Guidelines" or "USSG") went into effect. That Amendment lowered the sentencing ranges for most federal drug offenses by 2 levels, while another Amendment to the Guidelines made the changes retroactive. See Amendment 788 (amending Guidelines § 1B1.10). The reduced sentencing ranges are significant to Jesus Hector Palma-Salazar who in 2008 pled guilty to a federal drug charge and was sentenced to 192 months in custody. At that time, his Guideline sentencing range was 168-210 months. Under the lower sentencing range effected by Amendment 782, he faces only 135-168 months. Palma-Salazar has filed a motion to reduce his sentence, as is authorized by 18 U.S.C. § 3582(c)(2). The Government concedes that he is eligible for a sentence reduction, but urges the Court not to grant one

///

because, it contends, Palma-Salazar was a big time player in a notorious Mexican drug cartel.

A court must follow two steps in considering a motion to reduce a sentence under § 3582(c)(2). First, it must determine whether a defendant is eligible for a sentence reduction under the Sentencing Commission's policy statement in USSG § 1B1.10. Second, it must "consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by reference to the policies relevant at step one is warranted in whole or in part under the particular circumstances of the case. *United States v. Dunn*, 728 F.3d 1151, 1155 (9th Cir. 2013).

Palma-Salazar is eligible to have his sentence reduced. With the 2 level reduction authorized by Amendment 782, his amended Guidelines range is roughly 2 to 5 years lower than his original sentencing range. And because the low end of the amended range is less than his original sentence of 192 months, Palma-Salazar's sentence *could* be cut to 135 months. *See* USSG § 1B1.10(b)(2)(A). However, he requests a more modest reduction to 168 months.

But eligibility for a sentence reduction is not the same as entitlement to one. Both § 1B1.10(b)(2) and § 3582(c)(2) describe the prerogative to reduce a sentence in permissive terms (the court "may" reduce the sentence if the defendant is eligible), and the Supreme Court and the Ninth Circuit have characterized the decision as "discretionary." *See Dillon v. United States*, 560 U.S. 817, 827 (2010) ("At step two of the inquiry, § 3582(c)(2) instructs a court to consider any applicable § 3553(a) factors and determine whether, *in its discretion*, the reduction authorized by reference to the policies relevant at step one is warranted in whole or in part . . .") (italics added); *United States v. Colson*, 573 F.3d 915, 915-16 (9th Cir. 2009) (referring to the district court's *discretionary* denial of the defendant's 18 U.S.C. § 3582(c)(2) sentence reduction motion). So the question for the Court here is whether the facts and circumstances of Palma-Salazar's offense, his background, and other relevant § 3553(a) factors equitably support reducing his sentence.

/ / /

## § 3553(a) Analysis

Palma-Salazar's 2008 drug charge was resolved by a plea agreement. The agreement included a joint recommendation by the Government and Palma-Salazar for a 192-month sentence. Apparently confident that the Court would follow that recommendation, the parties waived a probation report and requested immediate sentencing. A bare bones probation report – one that turned out to be only 3 pages long – was later prepared. The report only summarily described the offense, and contained nothing about Palma-Salazar's background or his criminal history in Mexico. It did not discuss, for example, the length and nature of Palma-Salazar's ties to Mexican drug trafficking. Because there was no opportunity to interview the defendant, the report didn't include a personal statement from him or any explanation of his conduct. The skimpy, after-the-fact probation report has made the Court's § 3553(a) analysis more difficult.

The Government's Opposition to the § 3582(c) Motion includes additional facts about Palma-Salazar's criminal activity, his background, and his criminal history. In it, the Government refers to a Bill of Particulars that was filed in the underlying case and to an affidavit submitted by Assistant U.S. Attorney Todd Robinson in connection with the Government's successful effort to extradite Palma-Salazar from Mexico. The Court has reviewed both of these documents.

The Bill of Particulars tells the following story. As early as 1988, Palma-Salazar was part of a drug organization that imported large quantities of cocaine into the United States. For example, in February, 1988, he helped transport 1,420 kilograms of cocaine from Colombia to Mexico as a first step in smuggling the cocaine into the U.S. This wasn't a one-time venture. Between 1988 and 1990, Palma-Salazar and others arranged for 160 plane loads of cocaine to be brought from Colombia into Mexico, with each load ranging from 1,000 to 1,400 kilograms, and all destined for importation into the U.S.

Palma-Salazar also directly imported cocaine into the United States. According to the Bill of Particulars, between 1991 and 1993, he and others smuggled 25 *tons* of cocaine packed in chili cans into this country. On one particular date, October 26, 1992, they

delivered 160 kilograms of cocaine to customers in Pomona, California. Four months later, the defendant and others tried to import another 227 kilograms of cocaine, but that load was intercepted and seized. The seizure proved to be only a temporary setback; Palma-Salazar continued to smuggle even larger quantities of cocaine across the border. For example, on April 21, 1993, he tried to smuggle 7.3 *tons* of cocaine through the Tecate Port of Entry. That load was also seized, as was another 390-kilo load destined for Chicago.[1] Still another 8-ton load was seized on November 15, 1994. Despite these significant drug seizures, Palma-Salazar eventually succeeded in smuggling ten *tons* of cocaine into the U.S. during 1995.

Mr. Robinson's affidavit picks up where the Bill of Particulars leaves off. It alleges that Palma-Salazar was part of the Sinaloa cartel headed by El Chapo Guzman, which has been described as the "biggest drug-trafficking organization in history. . . ." *See*, Patrick Radden Keefe, "The Hunt for El Chapo," THE NEW YORKER (May 5, 2014), *available at* http://www.newyorker.com/magazine/2014/05/05/the-hunt-for-el-chapo. According to the affidavit, a reliable informant, whose testimony led to the convictions of two other Sinaloa cartel members, fingered Palma-Salazar in connection with the 390-kilogram cocaine load that was seized in Chicago in 1994. The informant's tip was corroborated by information from a court authorized wiretap.

A second informant reported that Palma-Salazar also trafficked drugs for the uncle of the Arellano-Felix brothers – four infamous brothers who headed a different drug cartel that operated for decades along the Tijuana-San Diego corridor. After a falling out with the uncle, Palma-Salazar wrested control over the drug trafficking trade in Tepic, the largest city in the state of Nayarit, Mexico. According to this informant, while the defendant "controlled Tepic," he managed to ship "multiple-ton quantities of cocaine from Mexico into the United States until he was arrested following a plane crash in June of 1995."

///

---

[1] Palma-Salazar admitted his involvement in the Chicago drug smuggling venture as part of his guilty plea in this case.

The fact of Palma-Salazar's plane crash and arrest by Mexican authorities is substantiated in the Government's Opposition to the § 3582(c) Motion. The Government alleges – and Palma-Salazar doesn't dispute – that Mexican law enforcement arrested him in 1995 after he crashed his private plane. Palma-Salazar remained in Mexican custody for 11 years. He was eventually tried and convicted of bribing Mexican officials to facilitate the escape of another member of the Sinaloa cartel. In 2007, the Mexican Government extradited him to the United States.

Counsel for Palma-Salazar has offered the following equities in support of a sentence reduction. Palma-Salazar is now 55 years old. In the past and while in custody, he suffered excruciating pain from a hernia. Surgery eventually fixed the problem. Between the time he was sentenced in 2007 and December 2013, Mr. Palma-Salazar was held at the Administrative Maximum Facility ("ADX") in Florence, Colorado. ADX is known as a "supermax" prison that houses inmates who have been deemed too dangerous, too high-profile, or too great a national security risk for even a maximum-security prison. While in ADX, Palma-Salazar was kept in solitary confinement 23 hours per day, and was not permitted to come into contact with other prisoners at any time. In December 2013, he was transferred to the United States Penitentiary, also located in Florence, Colorado. He is now housed among the general inmate population where he can interact with other prisoners. According to counsel, Palma-Salazar no longer poses a threat to public safety. The defendant plans to reunite with his wife and children in Mexico once he completes his sentence and is deported.

In ruling on Mr. Palma-Salazar's § 3582(c)(2) Motion, the Court is required to consider and discuss all relevant § 3553(a) factors. *United States v. Trujillo*, 713 F.3d 1003, 1009 (9th Cir. 2013). They include: the nature and circumstances of the offense and the history and characteristics of the defendant; the purposes of sentencing; the kinds of sentences available; the sentences and ranges established by the Sentencing Guidelines; relevant policy statements issued by the Sentencing Commission; the need to avoid unwarranted sentencing disparities among similarly situated defendants; and the need to provide

restitution to victims. The Court has considered these factors, and concludes for reasons outlined below that the defendant's sentence should not be reduced.

For at least seven years before his arrest by Mexican police, Mr. Palma-Salazar was actively involved at a managerial level with two major drug trafficking organizations. Those cartels were responsible for importing gigantic quantities of cocaine into the United States. Some of the drug loads were intercepted, but many made it in. In 1995 alone, the defendant helped import more than 10 *tons* of cocaine into the United States. Under § 3553(a)(1), the Court finds Mr. Palma-Salazar's criminal activity was much more extensive and serious than what is involved in the typical narcotics conspiracy or narcotics importation case. The huge amount of highly-addictive, destructive drugs he imported into this country – and the dismal tide of ill effects those drugs caused; the lengthy duration of his managerial oversight and control of the drug trafficking organizations with which he was affiliated; and his conviction for bribing Mexican officials to facilitate the escape of another leader of the Sinaloa drug cartel are all aggravating factors. Palma-Salazar's original sentence reflected the seriousness of his offense, and was proportionate to the harm that he caused. The original sentence served the objectives of providing just punishment for his offenses and promoting respect for the law, § 3553(a)(2)(A); and deterring him from involvement in ongoing criminal activity, § 3553(a)(2)(B).

The Court has also considered the kinds of sentences available and the need to avoid unwarranted sentencing disparities. When he was sentenced in 2008, Palma-Salazar faced a statutory maximum penalty of life in prison. His original Guidelines sentencing range, while advisory in nature, had the effect of reducing his exposure to less than half of the maximum sentence.[2] Although the Court could have initially sentenced Palma-Salazar to 168 months – the low end of his original Guideline sentencing range – it chose not to after

---

[2] The U.S. Sentencing Commission assigns a value of 470 months (39 years and two months) to sentences of life imprisonment for any statistical analysis in which a term of months is required. See U.S. SENT. COMM'N., 2013 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS S-170 (2014). This sentence length is consistent with the average life expectancy of federal criminal offenders. *Id.* Palma-Salazar's original advisory Guideline range was 168-210 months, which even at the high end was less than half of the statutory maximum for the offense.

1 analyzing the § 3553(a) factors. The Court's analysis has not changed over time, even
2 though the sentencing range has. In other words, the same aggravating factors that led the
3 Court to impose a 192-month sentence in 2008 persuade the Court that the sentence is
4 reasonable and should not be reduced.[3]

5       The Court also concludes that Palma-Salazar's sentence is not disparate in
6 comparison to other major drug defendants whom this Court has sentenced. Among these
7 similar defendants are many members of the Arellano-Felix drug cartel. This Court
8 sentenced most, if not all, of the Arellano-Felix defendants who had managerial authority
9 over the cartel's drug trafficking operations to prison terms exceeding 192 months. *See, e.g.,*
10 *United States v. Gilberto Higuera-Guerrero*, 2015 U.S. Dist. LEXIS 86706, at *11 (S.D. Cal.
11 July 2, 2015) (second-level lieutenant in Arellano-Felix drug cartel originally sentenced to
12 360 months; sentence reduced to 240 months pursuant to Fed. R. Crim. P. 35(b)); *United
13 States v. Ismael Higuera-Guerrero*, U.S. Dist. LEXIS 104024, *1, 11 (S.D. Cal. June 26,
14 2015) (top lieutenant in Arellano-Felix drug cartel originally sentenced to 480 months;
15 sentence reduced to 300 months pursuant to Fed. R. Crim. P. 35(b)); *United States v.
16 Francisco Javier Arellano-Felix*, 2015 U.S. Dist. LEXIS 77247, at *2-3 (S.D. Cal. June 15,
17 2015) (drug kingpin originally sentenced to life; sentence reduced to 282 months pursuant
18 to Fed. R. Crim. P. 35(b)). While it's possible to identify differences between Palma-Salazar
19 and the Arellano-Felix defendants, the Court considers his criminal culpability to be
20 comparable to theirs.

21       Turning to the equities presented by Palma-Salazar, the Court acknowledges that his
22 conditions of confinement were initially harsh, but that situation has changed with his
23 transfer to a different prison where he is now part of the main-line population. Besides,
24 prison, by definition, is a bad place to be, *see Arellano-Felix, supra,* at *15-16, and the Court
25 ///

26 ——————————————————
27 [3] The Court acknowledges that it is not permitted to engage in a de novo resentencing in a § 3582(c)(2) proceeding, USSG. § 1B1.10(a)(3), p.s. ("[P]roceedings under § 3582(c)(2) and this policy statement do not constitute a full resentencing of the defendant."), and is not doing so here.
28 Instead, the Court is merely reevaluating the relevant § 3553(a) factors, including the lower Guideline sentencing range, to determine whether a sentence reduction is warranted.

is reluctant to place too much emphasis on conditions of confinement as a justification for lowering the sentence of a major drug trafficker.

That Palma-Salazar was successfully treated in the past for a painful hernia likewise does not move the needle. For one thing, there is nothing to suggest that his hernia had anything to do with his incarceration as opposed to, for example, his age. *See, e.g., U.S. DEPT. OF HEALTH, EDUCATION & WELFARE, HEALTH STATISTICS FROM THE U.S. NATIONAL HEALTH SURVEY, HERNIAS REPORTED IN INTERVIEWS, UNITED STATES JULY 1957- JUNE 1959* (1960), at 2, *available at* http://www.cdc.gov/nchs/data/public_health/SeriesB_25.pdf (documenting relationship between advancing age and increased risk of hernias). Whatever the origin of his medical problem, Palma-Salazar's hernia was successfully treated by the Bureau of Prisons and therefore doesn't pose an ongoing concern or justification for reducing his sentence.

Finally, the Court is considerably less sanguine than Palma-Salazar's counsel that the defendant "no longer poses a threat to public safety." While he will certainly be deported once he completes his sentence, his removal to Mexico is hardly a guarantee against recidivism. The epicenter of Palma-Salazar's long term drug trafficking activity was Mexico, where he worked for the Sinaloa cartel. The news media recently reported that El Chapo Guzman, the head of the Sinaloa cartel, escaped from prison and is believed to be at large in Mexico. *Joaquin 'El Chapo' Guzman: U.S. Offers Reward for Escaped Drug Kingpin*, Associated Press, Aug. 6, 2015, *available at* http://www.nbcnews.com/news/world/joaquin-el-chapo-guzman-u-s-offers-reward-escaped-drug-n404991. The media also reported that Guzman has an estimated net worth of about $1 billion. *Id*. If true, this information tends to increase, rather than diminish, the risk that Palma-Salazar will be tempted to pick up where he left off. Under § 3553(a)(2)(C), the Court concludes that reducing the defendant's original sentence is antithetical to the goal of protecting the public against his possible further crimes.

///

///

## Conclusion

For the above reasons, Palma-Salazar's motion to reduce his sentence pursuant to Amendment 782 and 18 U.S.C. § 3582(c)(2) is **DENIED**.

**IT IS SO ORDERED.**

DATED:  8-10-15

*Larry A. Burns*

HONORABLE LARRY ALAN BURNS
United States District Judge